Case number 14-5325, Joseph M. Arpaio, Appellant v. Barack Obama et al. Mr. Klayman for the Appellant, Ms. Brickman for the Appellees. Excuse me, I have a little cold. Good morning, may it please the Court. My name is Larry Klayman. I'm the Attorney for the Appellant here, Sheriff Joseph Arpaio of Maricopa County. Maricopa County, by the way, is the biggest county in the United States. It accounts for 60% of the population of Arizona. This is a case not about immigration per se. I, myself, am pro-immigration. But what I took an interest in this case is the fact that this case comes right up against the Constitution and the Administrative Procedures Act. Whether you're conservative or liberal, Democrat or Republican, this is a case that concerns us all. Because it's the way our laws are enforced. While today we have a Democrat President, in a year or so we may have a Republican one. And we have to respect that rule of law. What would it be like if the President refused to enforce the tax laws, or the securities laws, or the environmental laws? Or for that matter, enforce the mandate, the tax on Obamacare? Mr. Klayman, the issue before us first is your client's standing to raise the challenges that he's raising. And it would be helpful to me if you could walk us through the theory of how the President's program is causing harm to your client. And precisely how you think that the relief that he seeks would redress that harm. Thank you for asking that question, Your Honor. What's important to remember, first of all, is there are two types of analysis in standing. There's the facial attack, and then there's the factual attack. This is a 12B1 motion to dismiss, which deals with the allegations of the complaint. The allegations of the complaint allege that my client, the Sheriff's Office in Maricopa County, expended in excess of $9 million from February 2014 to December 2014. That's empirical data. It's in stone. The reason that that money was expended because of the DACA, the Childhood Deferral Program, was because repeat offenders of criminals were having to go back into the jail. They weren't deported. The law was not being enforced. So we have concrete, particularized injury to the Sheriff's Office here. The government has made very clear that its policy is actually to prioritize the deportation of criminal aliens. And in order to do that more effectively, it focused its resources on that. So I wasn't entirely clear why those were the cases that you pointed out, the child molester or the felon, because as I understand it, there's no suspension of deportation with respect to those people. In fact, if there's anything that's speculative here, Your Honor, it's what the government is saying. We're the ones who submitted affidavit showing the harm to Sheriff Arpaio. There's no controverted evidence. In addition, the government says they don't have enough resources. Now, can I ask just a much more targeted question? I understand that the sheriff is drawing a causal connection between the DACA program and an increase in his jurisdiction of criminals that he has to incarcerate and deal with. But there's just a mismatch between that contention and the scope of the policy that has been adopted that's at issue in this case. Because those are the people that are – I think all those people are fully and arguably more subject to deportation under this policy. So that's what I'm looking for, a little more granularity than there is in your brief about the causal theory. Well, let me lay the foundation to answer that question. First of all, this is not a policy. That's how Judge Burrell Howell described it in the lower court. This is whether the law is being enforced or not. And consequently, characterizing it as a policy is inaccurate. In fact, at a minimum, the Administrative Procedures Act should be applied here because this is substantive rulemaking. It's dealing with the Constitution. It's violating the statute. It's arbitrary and capricious. It's not a policy, number one. So, therefore, the Secretary of Homeland Security does not get to decide what laws to enforce or not. That's for Congress to legislate, as Judge Hayden ruled in Texas. Can I ask you this question? So you're not – your argument is a challenge to particular executive actions, right? You're not saying that even independent of the executive actions, the perceived failure to enforce the immigration laws is causing harm. I mean, somebody could make that argument, but you're challenging particular executive actions, an executive action undertaken in 2012 and subsequent executive actions undertaken in 2014. Am I understanding your challenge correctly? I'm saying two things, Your Honor. I'm saying, number one, what is done usurps the power of Congress. By the President's own admission, he's not an emperor. Whether you're Democrat or Republican, Presidents are not emperors, number one. You don't get to supersede what Congress has legislated. That's one. Number two, if you want to take the position, which is incorrect, that this is a regulation, which it's not, you still have to follow the Administrative Procedures Act with notice and comment. But number three, there is real harm here. The government didn't refute it. They didn't submit one piece of evidence under oath or any other way to refute the sheriff of Ohio's office has been damaged here because of repeat offenders who are not deported who wind up back in his jails. Can I focus on that third point? Sure. My question is this. The harm that you're saying occurred is not from a general failure to enforce the immigration laws in the way that you would like to see them enforced. It's from some failure that stems from concrete executive actions. I know you disagree with whether those executive actions are lawful. I'm not talking about the legality of them. I'm just talking about standing. So what you're talking about is the executive action, which you disagree with, undertaken in 2012, and the subsequent executive actions undertaken in 2014, again, with which you disagree, that those caused an increased harm. It's not the general harm that already exists from your perspective from the failure to enforce the immigration laws. It's some increased harm that results from those challenged executive actions. Am I understanding correctly? That's correct. It's a greatly increased harm. So the question is how do those increase harms with respect to criminals if those policies don't, by their terms at least, in order to the benefit of criminal aliens, they in order to the benefit of non-criminal aliens by their terms, because they don't purport to relax anything with respect to individuals who have committed crimes. Well, again, Your Honor. That's the question. I refer you to the affidavits of Sheriff Arpaio on behalf of his sheriff's office. It's not just, and also the law and the pronouncements that have been put into effect by executive action. Only the most severe criminals are deported. But the lower-level criminals, for lack of a better word, they're in his jails, and that's raising the cost and has raised the cost to the sheriff's office in Maricopa County. Not only that, there's no evidence on the record that this administration has enforced the laws and deported criminals. Regrettably, we have a 30 percent increase in criminality during these DACA rules being in effect. So it's both. It's both. But the fact here is that this increases the harm, as Your Honor pointed out. There's a direct injury. That's what's different from other cases like the Crane case, the Crane case that was submitted to supplemental authority. Can I ask one question about the increased harm? On the increased harm, so far we've been focusing, and maybe because of a result of the questions, but we've been focusing on the increased harm with respect to undocumented aliens who are already here. I took a large part of your argument to be, and I thought it was the principal part, but I might have been misunderstanding it, that the increased harm comes from the incentives on individuals who are not here to come. I thought your argument was. That's part of it. That's part of it. But insofar as you're asking Judge Pillard and yourself about the particularized harm, the standing that is issued here primarily, we have made that factual showing, and the government did not refute it at all. So we went beyond what we had to show in a 12B1, and we actually submitted hard evidence to the court. I actually asked Judge Howell if we could take discovery. She said, no, it's not necessary. You put this on the record through affidavits. This is an extremely important case. It's really not about President Obama. It's not about this particular Secretary of the Department of Homeland Security. This court cannot allow the executive branch to run roughshod over Congress. We have a republic here. We have representatives in Congress who make the law, and if you don't like the law, you don't get to make the law yourself, even if you're President of the United States. This President has said in a political context, I took an action to change the law. That's at page 14 in our brief. We quote him. You're not going to be deported, he tells the illegal aliens. He has put himself above Congress. He's put himself above the APA. He's put himself above the American people, and this court has to put his foot down, and it doesn't matter what your political persuasion is. We have to preserve the republic in our system of government here. This is not right. Well, but we have to decide whether there is standing here, and so I think that's what our questions have been focused on, and it's difficult to try to pin down exactly how we follow the lines here. It seems to me that there are three things, at least three, that are being presented here. One is that these actions are ultra-virus, right, that the agency is doing something the agency cannot do. The other is that these are legislative rules, and therefore there should have been some kind of APA process. And the other is more generalized. But in each case, we have to have somehow to show that Sheriff O'Connor has an injury as a result of that. So that's what we're doing. I agree. I was giving a compassionate speech because I view this court as so important to protecting the American people, particularly in today's age. I understand that, but what we need, and what I understood the district court to be saying, is you can show these generalized costs have increased, right, but where is the connection, the causation, between those increases and DACA and DAPA? This is not merely generalized injury, as the district court tried to rationalize it. She saw this case as a political dispute. She didn't think that there was anything really going on between Congress and the executive. But in reality here, there's been particularized injury. It's in the affidavits of Sheriff Arpaio. His office has had to expend, as just one example, from February to December 2014, in excess of $9 million to house individuals who would have otherwise been deported except for DACA. That is a particularized injury. It's more exact than Judge Hayden found in Texas, where he found standing just based upon excess costs speculatively of driver's licenses. So, Mr. Kleiman, if the librarian in Maricopa County wanted you to represent him or her because the services provided by the public libraries are vastly taxed by having more people in the county as a result of this policy, or the family courts, or the schools, or the hospitals, or indeed if an individual taxpayer wanted representation because the quality of services enjoyed by that taxpayer are diluted and devalued by the presence of people in the county as a result of this policy, I trust that you would be here making the same argument on their behalf. It depends on the facts of each case. But I will say this. We put a lot of cases in our brief, Your Honor, D.C. Circuit, your court, where you are enforcing environmental laws in particular with regard to the Sierra Club and NRDC that deal with third-party alleged injury, regulations that haven't even come into effect yet, where individuals are coming forward and saying this is going to harm me. So, librarian, can I ask you a little bit more concrete question because that's the terms in which we have to deal with this case? So, if a librarian came to you and said, I'm willing to make out a declaration that says that after this policy was announced 2012 and then again in 2014, I perceived a big uptick in the number of people coming and borrowing books, and a lot of them were, you know, appeared to be speaking Spanish and coming from outside. And, you know, and I can tell you that's caused by this and in the year after this policy, they're very, very much higher and it's much more expensive. Would you argue that that person had standing? I think under your theory, I trust that you would. If it matched up exactly with the facts of this case, yes, I would. Well, what about the facts that I gave you? Well, in this case, you have a president who's decided he's going to make the law by his own admission. You have a direct conflict with Congress. As Judge Haynen pointed out in his decision, let me just quote you one section of it. And I'm also citing the immigration laws here. The laws are clear. We're talking about particular laws. Quote, Judge Haynen, it is Congress and Congress alone who has the power under the Constitution to legislate in the field of immigration. This is a very particular direct law by Congress. Don't mix in. 6 U.S.C. Section 2023 commands the Secretary of the Department of Homeland Security to carry out the immigration enforcement functions vested by Congress. 8 U.S.C. 1103a empowers the Secretary to enforce the immigration laws. There are no exceptions. Mr. Kleeman, what I'm asking, what I want to know is there are people being held in this jail, right? And some of them are illegal immigrants. And so the question is, are these people in custody, are they eligible for DAPA or DACA? Or are they just not being deported due to the executive's enforcement priorities? Most of them are eligible for DACA as currently constituted. So is that your argument? That's part of it. But it doesn't seem direct, right? The first argument is they are coming because they are eligible or think they will be eligible for some DACA-like program, right? That's not the primary argument. Yes, that is their drawing. We have opened the door and we've said come. The magnet theory is not what you're really relying on. You're just relying on the fact that they are incarcerated. That increases the cost. And you think they're still here because they're eligible for this program. That's been documented. You can look at the information and evidence that we provided. It wasn't just a bold statement in an affidavit. We backed it up with data, empirical data. The government could have refuted that. They didn't. That was actually an important answer because you said you were primarily relying on this magnet theory, that the announcement of a hospital program toward aliens was going to encourage more to come, but that is not your principal theory about the harm. I'm relying on both, Your Honor, because we have evidence of what happened, and therefore there's a strong presumption that it will continue to happen to an even greater degree because of this open-door policy that we have. And let me add one other thing. And do you have a response to, I think the district judge had said, you know, immigration is a very multi-caused phenomenon, and it's very difficult to isolate one particular cause, the circumstances in the country of origin, the availability of jobs or not in the United States, violence and other circumstances in the country of origin. Is there anything you can provide us just to help us isolate this policy as the magnet to draw people here? Well, I believe that I did, Your Honor. You know, the lower court judge, and I like her a great deal, Judge Howe, but she thought this was a political case, and she analyzed it in a political setting. I think in a political sense she means that it's for the very branches that you said, for the Congress and for the President. This is not a political case, Your Honor. This is a case, and I just read you two sections of the immigration code. It says it's to be enforced. Let me clear the air about something. I've known Sheriff O'Powell for a long time. He's my friend as well as my client. I've never heard one negative remark about Latinos or anyone else. I myself was married to a Latino. I'm not anti-Latin. I protected the community, the Cuban community in Miami for a very long time, and that's my home. This is not about discriminating against Latinos. This is about following the law, and that's your responsibility, not to look for a way out but to actually enforce the law. You're our last line of defense. We're the American people. We depend on you. If you look for a way, as Judge Howe did, to not rule. Can I ask you this question? You're not doing your job. We've drawn the divide between the magnet theory, which is individuals who are not yet here but who might be attracted to coming. Let's put that to one side because, as I understand your argument now, you're focusing on the people who are already here, and the argument is that but for the executive action, they would be deported. If not for the executive action, they would stay. I'm sorry, because of the executive action, they stay and they commit more crimes, and that causes the expenditure of resources by your client. Correct. They commit more crimes, they're re-arrested, and they're put back in jail. The question that I'd like to focus on is this, that in order for that theory to support standing, it seems like there has to be a substantial likelihood, which is the language of the Supreme Court's cases and our cases, that the relief you seek, which is, I guess at the end of the day, some sort of annulment of the executive actions, would in fact result in removal from the country of the individuals who are here and commit more crimes. Am I understanding? No, I disagree with that, Your Honor. Then how can you establish that? You don't need a substantial likelihood. I think I'm quoting the Supreme Court's cases and our court's cases that say there needs to be a substantial likelihood of regressibility. No. Not in this context. I see. Okay, because you have an immigration law that says they're to be deported. Yeah. There is no discretion here not to deport them. No more than there's no discretion to tell the IRS not to collect taxes. This is where I think it's important to draw a distinction between the general baseline objection you have to the failure to enforce the immigration laws, which I understand, and the effect of these particular executive actions that you're challenging. It's these particular executive actions that you're challenging that have to give rise to standing. And I guess with respect to those particular executive actions, I think what you need to show, the burden is on you to show a substantial likelihood that annulment of those executive actions would result in removal of individuals who stay here and commit crimes in a way that causes harm to your client. That seems like that has to be your view. I'm not saying you can't do it. I'm just saying that theoretically that seems like what you need to do, but maybe I'm misunderstanding. But we have set that forth in concrete empirical evidence that once DACA was implemented back in 2012, that the cost to the sheriff's office increased dramatically for having to rehouse convicted criminals who were not processed by ICE who then remained or were rearrested and put back in the jails. We have hard data. That's what's different than these other cases. So here's my question to you. Is your argument that if these policies were annulled by the court, that the consequence of that would be that the executive would then remove individuals who stay here and commit crimes? I thought your argument was that they don't enforce the law anyway, and so I'm not understanding how you would get regress on that. I don't understand your analogy there because what you're saying is we can't prove our case because the administration won't do its job. So, therefore, by not doing its job, they can defeat our case. No, I'm just taking your case on the terms of presenting it. Tails I win, heads you lose, or reverse. No, I'm focusing on the particular action you're challenging, which is not the baseline failure to enforce the immigration laws. It's the effect of these particular executive actions that you're challenging. And so in order to establish addressability, I think you would need to show, but correct me if I'm wrong, I think you would need to show that annulment of those particular executive actions would result in removal of individuals who stay. Well, it would under the law. I just read you the law. The law is the law, Your Honor. Congress has to remove them. Okay, so I understand. So you're assuming that the immigration laws outside the context of these executive actions would be enforced to their utmost, and if those laws were enforced to their utmost, that's how you would get redress. That's your argument? No, I'm not assuming that. You're not assuming that. No, what I'm assuming, what I'm saying is, is that the implementation of DACA and the benefits that are conferred therefrom, which go beyond what Congress has authorized and only Congress can authorize, has created injury, that we have set that forth in affidavits. It hasn't been controverted or refuted. The government couldn't do it. If they could, they would have. Look, Justice Department has 7,000 lawyers. Do you know how many I have? A few. They couldn't do it. So it's on the record that the injury has occurred. We cannot speculate as to what the administration, either Democrat or Republican, might or might not do. We just know the harm that's caused by the implementation of DACA plus the increased cost. And to answer Judge Poehler's question, it's both the empirical data of the injury and Judge Brown and also the fact that this is a magnet now to increase the situation. The President says, I'm not going to deport you under any circumstances. That's great to win an election, but that has nothing to do with enforcing the law. We're a country of laws and not men, our founding father John Adams said. This court has to stand behind that principle. That's the principle on which we were founded. You have to look at the standing and accept it, not like Judge Howe, try to find some way out of it. That's our duty. I'm not trying to be in any way disrespectful. I respect you. That's why I'm here. I'm not a conservative who believes the judiciary is the lesser branch of government. I believe you're the most important branch of government. And you have to stand in there for the American people. This is a bad precedent. And it can't, whether it's immigration or tax law or securities law or environmental law, you can't have the President make the law. That's not his role under the Constitution or the APA. I think it was your claim that we're all in agreement with you on the importance of the court and on the importance of the government and on the importance of the President following the law, and especially in the area of immigration. And we're not trying to struggle with you against your position on that. I think we're really trying to focus in a little bit more specifically on the redressability aspect of the case that you're presenting. And let me just try one more time. I realize that your time has expired. But the DACA program gives case-by-case potential relief at the discretion of immigration officials to people who came when they were children, were President of the United States in June 2012, continuously resided here for at least five years, are in school, have completed high school level education, or have been honorably discharged from the Coast Guard or other U.S. armed service, and have not been convicted of significant criminal offenses and do not otherwise pose a threat to public safety or national security. So if someone has been convicted or otherwise poses a threat to national security, this policy does not provide a basis on which immigration officials can allow them to stay in the United States. And I understand that Sheriff Arpaio has a lot of people in his jails that he wishes and believes are susceptible to deportation, and he wishes that the Executive Branch would deport those people. But the difficulty I think that at least I'm having is that this policy does not give them relief, and striking down this policy would not change the absence of relief that they now enjoy. And that's the difficulty in terms of causation that I'm having in understanding how the relief you're seeking could address the problem that your client faces. Your Honor, the quote that you just read, I think you inadvertently left out a word, significant criminal offenses. You read that, okay? Every other offense that isn't significant, they can stay. So who decides that? The reality is, based on the data, is that ICE has not been deporting criminals, and the use of the word significant is subjective. Well, there's actually more definition about multiple misdemeanors and felons. I mean, there's a lot more definition. You come to this country, and I'm not talking about traffic tickets, but you come to this country and you commit an offense, a drug offense, or you assault someone or you do something else, you don't deserve to remain in this country. You should be out of here. And that's somebody who's pro-immigration is saying that, me. I don't see that what you said vitiates the fact that these repeat offenders are winding back into jails, and that's injury. It's injury. It's more injury than Judge Hayden found in Texas with regard to processing driver's licenses. We have two judges now who have ruled that what the President has done is unconstitutional, a judge in Pennsylvania as well. So, to me, it's clear that DACA is responsible, and we've shown that on the record under oath. Government hasn't shown anything. Thank you. I may have two minutes to rebut if that's possible. Thank you, Mr. Cooney. Thank you. May it please the Court, Beth Brinkman on behalf of the United States. The District Court correctly dismissed the case for lack of standing. The District Court's opinion also highlights the nature of this case, which renders it non-justiciable. The plaintiff challenges the deferred enforcement of removal against third parties. That is an exercise of prosecutorial discretion that the Supreme Court and this Court have made clear is generally immune from judicial review. That is all the more true in the area of immigration, where the Supreme Court has emphasized that the legislature and the executive are more suited to the resolution of policy issues that touch on foreign policy and national security. First, I'd like to address the standing question that this Court is focused on. The District Court here definitively concluded at page 25 of the District Court's opinion that the plaintiff failed to meet the causation standard required to establish standing under Article III. The Court demonstrated and relied on the fact that the harm that the plaintiff claims here, harm is due to crime and due to illegal immigration, is not demonstrated as fairly traceable to the policies that he challenges here. And as the Court's questions, I think, indicate and reveal that these policies do not apply and do not allow even an application to be made by anyone who has been convicted of a serious crime or has not been here for five years. Precisely the group of individuals who would be least likely to come in contact with the criminal justice system. So Mr. Klain's argument, I think, is that it's true that the executive action says it doesn't apply to certain categories of criminal aliens. But it doesn't mean that everybody who's committed any misdemeanor can't get the benefit of one of the challenge executive actions. Is that correct? It's very limited, Your Honor, particularly with the discretion that's built in. There is the authority to deny deferred action to anyone who has any kind of contact with the criminal justice system. Specifically, the threshold guidelines, it's at page 101 of the Joint Appendix for the 2012 DACA policy, makes clear that those ineligible to apply include, as Judge Pillard was describing, significant offenses, but the more specific language there has to do with any felony, significant misdemeanors, multiple misdemeanors. And then there's also the very generous discretionary of what would present a threat to national security or to public safety. But there could be a single misdemeanor who could successfully seek relief under the 2012 executive action? That is within the discretion of the officials under the deferred action policy. The other thing I would like to point out is that the policy is quite clear that no one who has not been here before, under the more recent date even for the 2014 program, who was not here before January 1st of 2010, cannot apply. So, again, the speculation that is built into plaintiff's arguments is clear. It's an implausible and inherent theory that this would cause additional individuals to come who would not be eligible under these programs. So not that part of the case, because I think we were drawing a distinction between the idea that the executive actions would impel individuals to come to the country and the theory that the executive action already imposes harm because of the effect for people who are already in the country, as of the time when they were probably here. So with respect to that, the latter category, so take out of the field of vision the magnet theory for the moment. With respect to the latter category, what's your response to the point that, well, at least some individuals could end up, who are here already, could end up benefiting from the executive action? And it's the possibility that those individuals would benefit, therefore would stay, therefore may commit crimes, therefore increasing the resources expended by Sheriff Arpaio. Again, these are bold assertions of plaintiffs that don't meet the standard for causation. Even the person who might at some point have come into contact with a criminal justice system, who could even be eligible to apply here, would be someone who would have such an insignificant misdemeanor, which would not have even been of a level that were required being in jail for, I think, 60 days. I think it's such an unlikely speculative theory that those would be individuals who would come into contact and increase the crime and injury that the plaintiff claims comes directly from illegal immigration, but not from and has failed to demonstrate the traceability to the particular policies that he's challenging here. So let me see if I understand this. Is it your position that if DACA, DAPA were invalidated, that people currently eligible for discretionary relief under either program would be no more likely to be deported in the absence of those programs, would we invalidate them than they are today? Yes, Your Honor. In fact, plaintiff acknowledges this in his own filings. He talks about his preliminary injunction, motion at page 12, that these individuals should not be removed anyway. He also talks in paragraph 30 of his complaint that these harms he sees from crime and illegal immigration are occurring regardless of the details of any immigration policies he's challenging. So, yes. Now, he puts a lot of weight on the notion that, you know, Arpaio and the plaintiffs have put in declarations. They have evidence, and this is, I guess it's a little bit of a murky area. First of all, it's on the pleadings, but they also put in evidence, and the evidence they put in has not been controverted with evidence put in by the government. So I'm just trying to understand in terms of really at the sort of technical level, what the standard is for looking at the facts, and relatedly, is your response that the facts aren't enough, or is it more of a theory that even assuming actually everything that they allege and or state in the declaration is not enough? Do you see where I'm going? It's just a little murky. Judge Howell did assume the truth of the allegations of harm here, and that's why her determined allegations of causation, and causation is a factual question. Causation is a legal question. No, it's a legal question. It's a conclusion. And I think the cases like Twomley and Iqbal make clear that, you know, bold assertions of causation do not cut the mustard, so to speak, that indeed those are not reasonable inferences that have to be accepted by the court. And the court here did take an initiative to investigate the subject matter jurisdiction of the court and afforded the plaintiff an opportunity to submit additional evidence. He had requested a hearing, but his request for a hearing was limited to a request for the plaintiff himself to testify, and so the court's acceptance of additional declarations from the plaintiff certainly met that request. What would be enough here? I mean, this is a motion to dismiss, so we're at the very early stages of the case. And this is dismissed as speculative, but, you know, we've had a case in the environmental area where the court has said it's enough that, you know, Massachusetts' sovereignty will be infringed if its coastline might be affected many years from now by global warming. And I realize that there's some difference because that was a state and this is a public official, but what would be enough? I mean, why is the theory here not sufficient? I'd like to give a broad answer to that, Your Honor. I think it really goes to non-disability and some threshold doctrines, but I also just want to address Massachusetts v. EPA first, the case you referenced from the Supreme Court with the environmental claim. There was a very different situation. First, as you point out, it was a state, and the standing there was based on kind of a sovereign territory idea of the state's interest there, and also the statutory scheme there under the Clean Water Act had special provisions for review, so I think that's very distinguishable. But I think what your question really goes to is the second part. I tried to, you know, note in my introduction, not only is there standing here, but the court's opinion below really demonstrates why this is a non-justiciable matter. And there are a couple points I'd like to make in that. I think, first of all, this is an individual who's challenging the non-enforcement of law against someone else, and right there under Lynda Arras and the Shertan case, that is an area where we know is just presumptively not subject to review. The Heckler v. Cheney case under the APA also, when it talks about actions that are committed to agency discretion, gets into that. But it's broader than just the Heckler v. Cheney argument. Judge Hannon makes an interesting observation about that, which is that there's a difference between non-enforcement and no action, and something that affirmatively contravenes a statute. True, Your Honor, and even in Heckler, there was a note that acknowledged the Adams-type case where there might be abdication. But the case law for this court in particular has made clear that that is the extreme case where there was no enforcement whatsoever of the Title VI provisions or the federal funding cutoff requirements. Here, of course, that is far from the case. There is a limited amount of appropriations from Congress, and Congress has specifically, unequivocally, and explicitly vested in the Secretary of Homeland Security in 6 U.S.C. Section 2025, the authority to set priorities and policies. And indeed, that's a very crucial role because of the limited resources. And going to the redressability point, in order here against these policies would do nothing to increase the funding that would allow additional removal of aliens. So when you look at that, you have to step back and look at the picture here. And when you look at the past 6 years of removal, it's at a numerical high. The purpose of this policy is, in fact, exactly the contrary to abdication. Well, I'm not sure that I, you know, that that's a very persuasive argument to me because that whole idea that, well, we can't do what the statute says because we don't have enough money. But we can do exactly the opposite of what it says, and somehow that is consistent with our obligation under the statute. Your Honor, with – I understand that this is probably – I'm characterizing what you're saying, and so I admit that. But I think, you know, the question for me here is one argument might be that if we did not make it so attractive, that is to affirmatively offer benefits and work authorization and so forth, maybe less people would come, maybe people would self-deport. So it wouldn't cost us any money at all. So I don't think that argument really looks at both sides of the issue. But you've said several times this is non-justiciable. And I guess – so I guess what you're trying to point out here is that you think it's non-justiciable because, in your view, this is non-enforcement. Is that the argument? You're not saying political question or anything like that, right? No, although I think that those doctrines – there are a lot of doctrines that overlap in this area, and certainly the case law, it's a developed – a couple things I would say, Your Honor. With all due respect, I would not limit our argument to the inadequacy of funding. These policies, it's very important, are partnered with the priorities memo that really focuses that the Secretary of Homeland Security has taken so seriously the question of border security, national security, and community safety to prioritize in the three different stages the various individuals who are unlawfully here who will be prioritized for removal. And this is paired with that, Your Honor, to alleviate the need to expend those resources on individuals here who have already been here for five years. That's self-deportation, Your Honor. These are all people who have been here for more than five years. But if you write about that and the Secretary is really doing a good job and is really removing everybody that should be removed because they've got the priorities right now, then doesn't that – that sort of cuts against you because the argument that this wouldn't be redressed is an argument that, well, we don't enforce the immigration laws anyway, and so these people would still be here. But if, in fact, you're doing a really good job of that, then that actually gives more potency to the argument that it's the other way around. I think that's really where the limited resources do come in because these are the people who are less likely to be removed because they don't have a criminal record and they're not a priority. So I do think that comes into play. But if I could shift just for a moment. What is the justiciability? There's one way to understand justiciability-like concerns, which is that standing doctrine generally serves to promote separation of powers values and separation of powers interests are implicated in this case. But that's a standing argument. Are you making a freestanding judicial justiciability argument that's something other than political question? There's some other justiciability principle that says that we can't – that this suit is incapable of resolution by the judiciary? We do point out in our brief that there are other prudential considerations for why this case is not subject to adjudication. And a couple points I would make on that. I think it's the first, the non-judiciable doctrine about the third party challenging non-enforcement against a third party, and particularly in the area of immigration. The Supreme Court in Arizona in the AADC case, the American Arab Anti-Discrimination Committee, made quite clear that the executive has discretion about whether to commence removal proceedings. And Heckler v. Cheney makes clear that those types of decisions that are committed to executive discretion are not amenable to adjudication because there's no standard by which to measure them. So they're certainly not – they're exempt from the APA, a challenge to that kind of non-enforcement. But even more broadly, we would say even the notice and comment challenge here come under that because of the nature of these cases. And let me just talk about it. You're saying assuming standing exists? Even if there were. And I should point to the series of cases that we talk about at pages 27 to 28 of our brief. There was a series of challenges. I see my time is up if I can continue. Please. There was a series of cases in 1996 where many states challenged, made very similar challenges like this to the alleged non-enforcement of immigration laws. Several of the circuits, all of the circuits rejected those on different grounds, and several on non-justiciable grounds. Many of them focused on the political question type argument. But we know from Matthews versus Diaz and all the way that the Supreme Court talks about the immigration area looks at similar factors to the Baker v. Carr factors for a political question. So we look at it more in this more general non-justiciable, particularly with the Heckler v. Cheney, the overlap between the reasons why administrative action is not subject to review there. And several of those circuits also look to Heckler v. Cheney in dismissing some of those claims. But curiously, so here the briefing is really focused on standing, and several of those cases assume without deciding that there is standing and then go on and say, as you say, for whatever reason, immigration context, political question. And I guess one way of maybe sharpening this is, is there a party that you can imagine that does have standing to challenge DACA or DAPA? Let me say this. In this realm, in light of these cases, this type of challenge challenging the non-enforcement against a third party in immigration cases typically been rejected. There may be some more isolated scenarios, certainly in the Mendoza v. Prez case, where it looks at aspects of the immigration laws that have to do with the workforce and employment, for example. But I think what's important to look at is also, for example, this circuit's opinion in the Fair case from 1996. That, I think, is a very telling case here. That was a case that was brought by a group of citizens from a limited area, Miami, claiming very similar challenges here, that there was a presidential decision, executive decision to allow 20,000 Cubans to be paroled in and then to seek lawful permanent residence status on an annual basis. Yet this court found that there was no cause of action, well, that the plaintiff there was not within the zone of interest of the statute. And that certainly applies here, too. A lot of these cases were before Steele Co. and before Lexmark. So I think that the terminology that we use is one of the issues here. And that's why I try and couch it. That's the difficulty for us, though, is that we've got all these doctrines that sort of are the gist of, you know, and so where is the right place? And, you know, you can understand why Mr. Klayman is sort of feeling like, wait a minute, there seems to be in the part of the courts a motivation in search of a doctrine as opposed to a doctrine that's compelling an outcome. And, you know, that puts us in a very uncomfortable light. So, you know, one, or not. Tell us why. I mean, are you not going to pay for it? I can try and put them in boxes for you. I think there are many alternative grounds on which this case should be dismissed. The standing traceability, lack of traceability is quite clear, unequivocally concluded by Judge Hall on page 25 of her opinion. I think it's deeply rooted in the speculative nature and the implausible kind of incoherent theory of causation of the challenged policies. The challenged policies, any action against them are not going to redress whatever harm. We assume the plaintiff is suffering from crime and illegal immigration. That has not been tied to that. I think second more is a more general justiciability. The nature of this case, the cases from the 1990s, again, this court's decision of fair, I think, is very helpful. And Linda R.S., as you mentioned. Yes, Linda R.S. and Shertan go to the non-justiciability of challenges against the non-enforcement against a third party. And I think that's very clear in the immigration area. And I would point out, statutorily, when you look at what Congress has done under 1252G, the statute at issue in the AADC case, even an alien who wants to challenge kind of a selective prosecution theory that, you know, the deferred action for someone else is an issue for the individual alien is very narrowly circumscribed by the statute. So we are in an area, Your Honor, where I think there is very little room, and the Supreme Court has made clear there's a narrow room for judicial review here. Another case I would like to just ask you, because there is a case out there where an injunction has been issued. And I think the harm there was that states would clearly be the entities that would have to issue the driver's license and so forth under the benefits side of DACA and DAPA. And so there is a court that said, well, that's enough, you know, of an injury. And that's not speculative. We know that's going to happen. But the question I have is, at least at the state level, isn't concern about public safety and crime and that sort of thing at least equal as a sovereignty concern to the sea level rise taking a few inches of shoreline? It's two things I'd say, Your Honor. I think the case of the 1990s really go through and look at that. And also this court's decision in the Pennsylvania v. Kleppe from earlier, it was a challenge to whether or not the Small Business Administration was adequately providing funding following a hurricane. And there were similar claims about the economy, the tax base, all of these injuries. Well, I think that the cases in the 90s, pardon me for interrupting you, had a lot to do with this notion that, you know, these are just the fortunes of federalism. You know, these increased costs, you know, for your social welfare network and that sort of thing. But I'm just wondering, one, you know, Massachusetts, the EPA hadn't happened then. But I'm also wondering if this isn't a little different. In other words, to say, well, you know, this impacts us very generally. We have these increased costs because we have increased population. But very specifically, if you're looking at questions of sovereignty, right, if it's impacting the lands of our citizens with these trespasses and so forth, if it's a concern that there are increases in law enforcement because there's increases in crime, which means there's less public safety and so forth, why, you know, why is that not enough? The cases speak at length about this, perhaps in somewhat different language, but it really even comes back in the Pennsylvania v. Kleppe case, not to introduce another doctrine, but, you know, they also reject the parents pay trade type argument. And that's really, in a sense, Your Honor, what you're talking about, a jurisdiction within the United States being able to sue on behalf of this generalized grievance of its citizens against the United States. But we know from Massachusetts v. Mellon that that is not allowed in the federal system. And indeed, in the area of immigration, there is recourse to the political branch of Congress. You know, there really isn't because there are only four border states, and that makes them they're really, you know, not able to have the kind of political clout. It's not a generalized problem often. That's exactly what this court had before it in the fair case. And the D.C. Circuit held that that citizen group from Miami did not have some special regional interest. Just as citizens there, you know, there's not much that we can say about it. But does it make a difference if it's a state, if it's a public official, or are we all just in the same boat? I think when you look at the zone of interest inquiry and whether there's a cause of action under the APA, they would not be within that zone of interest. You know, I find that really interesting because you would would you say that this is these are legislative rules, right? Or do you agree with that? No, we believe this is a statement of policy that's not subject to notice. Well, let's assume that they were legislative rules, okay? Let's assume that there were benefits tied to them and that people were actually bound by this articulation of policy. So it would be a legislative rule. And your view would be Sheriff Apayo is not within the zone of interest for, you know, arguing that he was entitled to notice and comment that this was going to happen. Yes, Your Honor. So who would be within the zone of interest? Only illegal immigrants? Well, certainly when you look at an APA cause of action in the zone of interest there, you look to the underlying substantive statute. And I think FARE is instructive in that area. These other cases about the state's regions are not within the zone of interest to bring suit under that. And I think that that makes sense, Your Honor, when you look at the Supreme Court's recent Arizona case, for example. That opinion made quite clear that states are not in a position to challenge federal immigration policy through legislation. And here we would, you know, urge the same type of argument that states cannot try and do that through the judiciary either. And one thing that I think often gets lost in this debate about immigration policy is really the foreign policy consequences. I just want to go back to the FARE case again because that case involved an agreement between the United States and Cuba that followed one of the boat lifts, you know, just a tragic situation. So the countries came together, and part of the solution was that the United States said, okay, we'll do 20,000 paroles annually, and then we'll have the lawful permanent residence ability to seek that. That is a great example of why this is left to the federal government to speak with one voice in immigration because immigration does touch upon foreign policy and international relations, not to mention national security. So I do think it's a unique area that the Supreme Court has really recognized. The flip side, too, I just want to point out is that, of course, plaintiffs' theory of standing is without limit. Under this theory, every time there was a new temporary protective status, which is generally a group of people from a particular country, for example, the plaintiff could come in and bring the same type of suit, alleging that there was going to be harm to him from crime and illegal immigration without being able to trace it back to the challenge policy. And we think that is what the bottom line ruling of the district court here was, that there was no standing. And we do think that the additional grounds of non-justiciability, lack of cause of action, are also grounds on which the case could be dismissed. But he did trace it back to the policy, at least in the statement in the affidavit, right? Because I think in the affidavit, the statement is made that there has been increased cost to me because of the effects of the challenge executive actions. And the district court on page 25 rejected that for a couple of reasons. One, she explained the lack of traceability in that when you look at other parts of the arguments that plaintiff makes, he also argues that it is regardless of the details of the policy, it's the general immigration policy overall because people aren't being removed that is causing that. That is the antithesis of non-prioritizing. People aren't criminals to allow the removal of the people who would be more likely to come into the justice system. She also points to the fact that in his preliminary injunction argument, he argued that these low-priority individuals would not be removed anyway, again going to the redressability point. And she also, the court also spoke about the speculative nature of the future entry, pointing out that any kind of order would not provide more funding to remove all aliens who are here unlawfully as plaintiff urges, nor would reduce crime, nor would stop people from entering, which is a third-party decision, which the district court pointed to one of the issues that this is such a difficult area, Your Honor. I think this all goes back to one of Judge Brown's questions. These cases inherently challenge regulation of a third party, and many of the cases, the American Hospital Association and Brock and other cases, the wrestling coaches case, I'll point out that when you have a third-party actor, it's very difficult. Those are all cases in which it was too speculative because you can't trace it to the challenge policy. It's rather the actions of an independent third party. We urge you to affirm the district court. All right. Thank you. Thank you. Of course, Mr. Clayman, you're out of time. I'm out of time. Thanks. I might point out that Maricopa County is larger than 24 states in this country. It's huge, so it has a significant impact what's happening in that jail. Secondly, Your Honor, Judge Brown, you hit the nail on the head. This is a motion to dismiss. If the government wants to come up with new ideas here, and what I heard was testimony, not really argument, they never put it in an affidavit, they'll have an opportunity to take discovery and prove their point. I think this case should proceed forward at a minimum. Thirdly, the case of United States v. Mills, Supreme Court case, is instructive. When the government violates a constitutional right, injury is presumed just from the violation of the Constitution. And that case stood for the proposition that one day of the violation of the Constitution is injury and one day too much. It's also important to recognize that the Justice Department, under the Obama administration, itself issued an opinion in the Office of Legal Counsel. I'm an alumnus of the Justice Department. I respect what it said, and when it said the first time, before politics entered into it, it told the President, you can't do this, and he went out to justify to the Latino community, I can't do this, I'm not an emperor. This was a reversal. There was a reversal that was convenient at the time, and Republican presidents have done the same thing, but that doesn't make it right. And last but not least, the government never asked for more money for enforcement. That's on the record. In fact, Congress appropriated more money, despite the fact that this president and the executive branch never asked for it. So what we heard here, in and of itself, was an argument that we, the executive branch, are above the law, we're not accountable to the American people, we don't recognize that people can be injured here or sheriff's offices or Maricopa County. We get to do what we want, and we can't allow that to happen in this country. This is just not what we're based on. Thank you for your time. Thank you, Mr. Clinton. The case will be submitted.
judges: Brown, Srinivasan, Pillard